UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
DAMON L. FERGUSON,

                Plaintiff,                        **OPINION AND ORDER**
                                                                                  01 CV 1259 (NG)(RML)
  - against -

**NEW YORK CITY TRANSIT AUTHORITY,
MABSTOA, METROPOLITAN
TRANSPORTATION AUTHORITY,**
                Defendants.
----------------------------------------------------------x

**GERSHON, United States District Judge:**

      *Pro se* plaintiff Damon L. Ferguson brings this action against the New York City Transit Authority ("NYCTA"), the Manhattan and Bronx Surface Transit Operating Authority ("MABSTOA"), and the Metropolitan Transit Authority ("MTA"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. Plaintiff also brings discrimination claims under New York state and local law and tort claims under New York state law. Specifically, plaintiff brings race discrimination, hostile work environment, and retaliation claims. Defendants seek summary judgment on all claims. In his opposition papers, plaintiff raises, for the first time, claims that defendants violated the Americans with Disabilities Act, 42 U.S.C. §§ 12112 *et seq*. ("ADA"), by terminating him after learning of plaintiff's alleged disability and that defendants retaliated against him because he filed this lawsuit.

                              **FACTUAL BACKGROUND**

      Unless otherwise stated, the following facts are undisputed. Plaintiff is an African-American male in his thirties, who was formerly employed as a Level II Computer Associate, in the Capital Program Management, Signals and Systems Division ("CPM") at MABSTOA, a statutory subsidiary of the NYCTA. Plaintiff was hired by MABSTOA on June 14, 1999, on the

recommendation of Marjorie Miller, a Computer Specialist. Ms. Miller, who is also African-American, became plaintiff's direct supervisor at the 1350 Sixth Avenue location, which was under the direction of Joseph McDermott, the then-Senior Director of CPM. While at 1350 Sixth Avenue, plaintiff, along with Ms. Miller, and Tony Wong, who was also a Computer Associate, performed coding for the 63rd Street connection project. "Coding" consisted of reviewing pre-written software programs and preparing documentation and procedures to support and maintain the programs once they were in operation.

On October 14, 1999, plaintiff witnessed an office dispute between Ms. Miller and another supervisor regarding an assignment. The following day, upon Ms. Miller's request, plaintiff accompanied her to the Office of Civil Rights ("OCR"), which is defendants' internal Equal Employment Opportunity department that investigates complaints of discrimination by its employees. While at OCR, plaintiff recounted what he witnessed as between Ms. Miller and the other supervisor. Plaintiff stayed at OCR for less than half an hour, during which time he did not write anything down, sign any papers, or file an individual complaint. Although the parties' papers do not provide details, it appears that Ms. Miller ultimately brought suit against the NYCTA for its allegedly discriminatory practices.

Within one month of this incident, plaintiff initiated a meeting with Mr. McDermott to discuss plaintiff's opportunities for promotion. The Computer Associate position carried three levels (Level I, II, and II), and ranged in salary from approximately $38,000.00 to $69,000.00 per year. Plaintiff was hired at Level II, and made $55,000.00 per year. Plaintiff asserts that, according to Mr. McDermott and Ms. Miller, he was entitled to a promotion because he was hired as a lower level Computer Associate, but at the highest salary grade offered for that lower level position. Mr.

McDermott explained to plaintiff that, although company policy required at least one year of work prior to receiving a promotion, he would consider an exception if Ms. Miller submitted a written recommendation justifying plaintiff's promotion. Ms. Miller did not submit such a recommendation, though aware she could do so.

On November 10, 1999, plaintiff submitted his resume in response to a Job Vacancy Notice ("JVN"), advertising an open Computer Associate position in the Information Services division. The JVN required candidates to have received a baccalaureate degree and to have had three years of full-time computer experience, or a "satisfactory equivalent" of experience and education. Def. Ex. 5. Plaintiff was not selected to interview for this position. Defendants assert that, because plaintiff "already held the title of Computer Associate and had not been employed for a year," he was not interviewed for a promotion to a higher level.[1] McDermott Aff. ¶ 14.

Plaintiff also submitted his resume in response to a Computer Associate, IT Infrastructure, position, posted on or around July 17, 2000. This position required a baccalaureate degree in Computer Science or a related field, and a minimum of one year of computer mainframe experience. Plaintiff was not called to interview for this position. Defendants contend that plaintiff did not have the requisite mainframe computer experience, and therefore, he was not considered for the position. Plaintiff's resume does not indicate that he had such computer mainframe experience, and plaintiff fails to provide any additional evidence showing otherwise. Def. Ex. 4. Plaintiff also does not

---

[1] The March/April 2000 Operations Systems Newsletter, clarifies promotional procedures within the department. Def. Ex. 3. The memo, which plaintiff reviewed upon receipt in 2000, states that "no employee will be recommended for promotion until at least one year...[of] a previous promotion or initial hire." *Id.* The memo also states that, although open positions for Computer Specialists could be "underfilled" as Computer Associates, these postings could not be considered opportunities for "backdoor promotions." *Id.*

provide any information regarding the individuals who were interviewed and ultimately hired.

Plaintiff also submitted his resume to be considered for two Computer Specialist positions, posted June 23rd and June 30th of 2000. These positions required a bachelor's degree in Computer Science and four years of computer software/data administration experience, with at least one year in a project leader capacity or as a major contributor on a complex project. Defendants assert that plaintiff was not interviewed because, based on his resume and cover letter, plaintiff did not have the requisite project leader or management experience. McDermott Aff. ¶ 14. Plaintiff, however, states that he was employed in a project leader capacity when he served as a Marketing and Communications manager for J.R. Ferguson, Inc., from January 1997 through April of 1998. Pl. Dep. at 495. Plaintiff was not called in to interview for either of these positions. Plaintiff does not offer any additional information about his prior supervisory experience, nor does he provide any information regarding the individuals who were interviewed and ultimately hired.

In late 1999, CPM became the Telecommunications and Information Services, Division of Software Systems ("TIS"). As a result, Mr. McDermott transferred plaintiff, Ms. Miller, and Mr. Wong, to the NYCTA's 130 Livingston Street location. Richard Washington became their new supervisor. Mr. McDermott states that he transferred these individuals because they were the only coders on the 63rd Street project, and the rest of the individuals at 1350 Sixth Avenue were analysts. McDermott Aff. ¶ 8. Within one month, the remaining members of CPM were also moved to 130 Livingston Street.

At the new location, plaintiff, Ms. Miller, and Mr. Wong, were seated in an area separate from the rest of the 63rd Street group, specifically, in an area on the opposite side of the floor. Plaintiff does not recall questioning or complaining to any of his supervisors regarding the new

4

seating arrangement. Pl. Dep. at 284. Plaintiff does not allege that the decision to transfer him to 130 Livingston Street was discriminatory; rather, he claims racial discrimination "to the degree that [he, Ms. Miller and Mr. Wong] were separated" from the rest of the group. Pl. Dep. at 274.

On May 25, 2000, plaintiff received an "Official Warning" from Mr. Washington reminding plaintiff of proper signing in and signing out procedures within the department. Plaintiff admits he received this memo after inadvertently failing to sign out in accordance with those procedures. The memo stated that any nonconformance to the policy would result in disciplinary actions.

Plaintiff believes that Mr. Washington effectively denied him a promotion based on an employee newsletter, which states that, "[n]o employee with a most recent performance evaluation of less than 'fully satisfactory' will be recommended for a promotion." Def. Ex.3; Pl. Dep. at 292, 310, 311. Plaintiff asserts that the placement of the warning letter in his file prevented him from receiving a satisfactory review; however, plaintiff was permitted to place a rebuttal letter in his file. Moreover, plaintiff has not presented any evidence indicating that he received any evaluation that was less than satisfactory.

Plaintiff also claims that Mr. Washington unfairly denied him the ability to work overtime. Pl. Dep. at 493. In the new group, employees were required to receive prior approval from Mr. Washington before working any overtime. Def. Ex. 3; Pl. Dep. at 492. Plaintiff acknowledges that no other employees worked overtime without first receiving approval from the manager and that no other employee worked more overtime hours than he did. Pl. Dep. at 494. Plaintiff claims that Mr. Washington issued the warning memo and denied him the ability to work overtime, in retaliation for his involvement with the filing of Ms. Miller's OCR complaint.

On June 20, 2000, plaintiff filed a charge with the EEOC alleging that, beginning in March

5

of 2000, defendants discriminated against him on the basis of race and retaliated against him. Specifically, plaintiff charged that defendants denied him four promotions, for which he was qualified, and that white employees, who he believed were less qualified, received the promotions.

That same day, a co-worker gave plaintiff a handwritten note, containing pornographic websites. Plaintiff asserts that Mr. McDermott, in an effort to entrap plaintiff, instructed one of the supervisors to tell plaintiff to log onto the NYCTA's Internet service to view these prohibited sites. Plaintiff provides no evidence supporting this allegation, and instead, relies only on his information and belief of such a conspiracy.

In October 2000, plaintiff was transferred out of Mr. Washington's department to another project located at the Jamaica Yard because there was an "urgent need" for his help with an important RSMIS project. McDermott Aff. ¶ 9. Plaintiff experienced many difficulties at the Jamaica Yard, which he detailed in a letter written on December 21, 2003 to Al Jones, the Technology Director of TIS. Pl. Ex. U.

For example, on November 16, 2000, plaintiff was asked to attend a pot-luck lunch for Mr. McDermott. When plaintiff declined, he alleges that a co-worker, Rosemary McGee, sarcastically stated, "I know why. It is because they did not want you down there at Livingston anyway. They wanted to get rid of you." *Id*. Plaintiff also claims that he was offended when Ms. McGee made sexually inappropriate comments to him, first on November 21, 2000, when Ms. McGee stated that she and another co-worker, Terry Fisher, could "sandwich" plaintiff, and second, when Ms. McGee asked, in front of another co-worker, whether plaintiff was "passionate." Pl. Dep. at 376; Pl. Ex. U.

Plaintiff also wrote that Mr. McDermott was harassing plaintiff by having his secretary continuously call plaintiff's line to ask for another co-worker. Plaintiff expressed his concern that

the new RSMIS assignment was not allowing him to use and develop certain computer skills that were critical to his career development. Specifically, plaintiff stated that the transfer "out of Livingston Street is not helping, but is indeed hindering the enhancement to my professional career that was promised to me by Joe McDermott." Pl. Ex. U.

On February 14, 2001, plaintiff wrote Mr. Jones another letter, reporting an incident in which a maintenance supervisor "peeped" into his bathroom stall, while plaintiff was relieving himself. Plaintiff acknowledges being in the bathroom stall for approximately three hours, from 9:10 a.m. until 12:10 p.m, but never explains the reasons for his delay. Plaintiff alleges that this was the third such incident, and that, as a result, he feared for his "safety and well-being." Def. Ex. 11. Plaintiff indicated that he would not return to the Jamaica Yard, and requested that he be taken out of "that hostile work environment immediately." *Id.* Plaintiff was reassigned to the Paratransit Unit located at 2 Broadway on February 15, 2001, while the matter was being investigated.

Plaintiff filed this action on March 2, 2001. On March 22, 2001, Mr. Washington sent a letter directing plaintiff to return to work at the Jamaica Yard on March 26th, as the NYCTA had investigated the "peeping" incident and determined that the "behavior of the [supervisor] in question was appropriate," and that he followed "the proper procedure when told of a possible sick employee when they entered the bathroom to investigate." Def. Ex. 15. Additionally, the letter noted that plaintiff was being returned to the Jamaica Yard because his performance at 2 Broadway did not "meet their needs and expectations." Def. Ex. 15.

That same day, plaintiff received two letters of insubordination. The first, from Brian Altschul, Paratransit Support Manager, Software Systems/TIS, reprimanded plaintiff for failing to follow instructions given to him by his manager on February 20th and February 28th of 2001. Pl.

7

Ex. B. The second letter was from Larry Greenfield, RSMIS Project Manager, Software Systems/TIS, and reprimanded plaintiff for failing to follow proper sign in/sign out procedures on January 19th through January 20th, and on January 24th through January 26th of 2001. Plaintiff provides a NYCTA time and attendance report which indicates that he was out sick from January 19th through January 20th of 2001, and that these sick days were approved by a manager. Plaintiff states that, upon receiving these insubordination letters, he began having chest pains, and called Ms. Miller, who advised him to see his physician.

Plaintiff did not report to work on March 23, 2001 and did not report to the Jamaica Yard on March 26th. Additionally, contrary to his past practices, plaintiff did not call to inform a manager that he would be out of the office for an extended period of time. Therefore, plaintiff was considered to be Absent Without Leave ("AWOL") as of March 23, 2001. The Office of Labor Relations sent plaintiff three letters, dated March 30, 2001, April 5, 2001, and April 16, 2001, indicating that, if he did not respond, or fill out the Family Medical Leave Act ("FMLA") form which was included with the final letter, plaintiff would be terminated. Plaintiff ignored these requests and instead sent a letter from his doctor to Ronald Osson, Manager, Office of Labor Relations/Field Support Operations, which recommended that plaintiff "remain off duty until the situation was resolved." Pl. Ex. O. Plaintiff also had his father call to speak with an assistant of Patrick McGreal, Director, Office of Labor Relations Maintenance of Way and TIS, regarding his employment status. Neither party provides any evidence regarding the content of this conversation. As plaintiff refused to either visit the Office of Labor Relations or fill out the FMLA form, plaintiff remained AWOL and was terminated on May 11, 2001.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is granted if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Once a moving party has carried its burden under Rule 56(c), the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Rather, the non-moving party must produce evidence in the record and "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" *Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir. 1999) (quoting *D'Amico v. New York*, 132 F.3d 145, 149 (2d Cir. 1988).

When considering a summary judgment motion in the context of a discrimination suit courts have the additional task of reconciling the necessity of relying on "the cumulative weight of circumstantial evidence," with the "salutary purposes of summary judgment... avoiding protracted, expensive, and harassing trials." *See Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991); *see also Weinstock v. Columbia University*, 224 F.3d 33, 41 (2d Cir. 2000). However, as here, where the standards of rule 56 have been met, summary judgment "is appropriate, even in discrimination cases." *Id.* at 41.

**DISCUSSION**

Title VII makes it unlawful for any employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin..." 42 U.S.C. § 2000e-2(a)(1). Taking plaintiff's filings as a whole, and construing his allegations liberally, plaintiff asserts the following claims of discrimination: (1) defendants, through the actions of Mr. McDermott and other co-workers, racially discriminated against him by creating a hostile work environment that was "targeted, directly or indirectly, to have [p]laintiff removed from the Department as soon as possible;" (2) defendants discriminated against plaintiff after learning of an alleged disability by terminating his employment on May 11, 2001; (3) defendants, through the actions of a management supervisor and a co-worker, created and maintained a sexually hostile work environment for plaintiff; (4) defendants retaliated against plaintiff for his involvement with his supervisor's filing of an internal discrimination complaint by failing to promote and/or hire plaintiff to a higher level position, denying plaintiff the opportunity to work overtime, and placing an administrative warning in his personnel file; and (5) defendants retaliated against plaintiff for filing this lawsuit by presenting him with two insubordination notices and directing him to resume working at the Jamaica Yard on March 26, 2001.

Under Title VII, discrimination claims must be analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case, plaintiff must demonstrate that (1) he belongs to a protected class; (2) he was qualified to perform the duties of the job at issue; (3) he suffered an adverse employment action;

and (4) the circumstances surrounding that action permit an inference of discrimination. *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). Plaintiff's burden of establishing a prima facie case is de minimis. *Abdu-Brisson v. Delta Airlines, Inc.,* 239 F.3d 456, 456 (2d Cir. 2001); *accord id*. Once a plaintiff has established all four elements of the prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged termination. Once an employer has done so, the presumption of discrimination drops from the case, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), and the burden shifts back to the plaintiff to prove "that the legitimate reasons offered by the defendant ... were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Proof that the employer's proffered reason is unpersuasive is not necessarily sufficient to defeat a motion for summary judgment because it does not necessarily establish that plaintiff's proffered reason is correct. *See St. Mary's*, 509 U.S. at 524. "Once a minimal prima facie case is proved and the employer's nondiscriminatory explanation has been given, the *McDonnell Douglas* presumptions disappear from the case and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Assoc.*, 233 F.3d 149, 156 (2d Cir. 2000).

**I. Race**

Construing *pro se* plaintiff's submissions liberally, it is unclear whether plaintiff is, in fact, alleging racial discrimination. Plaintiff's papers are permeated with his belief that Mr. McDermott, who is white, had a personal motivation to maintain the homogeneous makeup of the department and subsequently engaged in racist conduct in order to have plaintiff, an African-

American, removed. However, when asked to clarify whether the cited conduct was racially discriminatory or retaliatory, plaintiff repeatedly confirmed that it was retaliatory, and not based on plaintiff's race. Pl. Dep. at 273, 292, 311, 329, 344, 360, 363, 365, 367, 453, 493.

Ms. Miller, who herself brought an action for discrimination against the NYCTA, revealed in her June 9, 2003 deposition that she thought that plaintiff was discriminated against when he first began working at MABSTOA. She cited various incidents to support her belief that Mr. McDermott "did not take her hiring a qualified black male seriously," including that plaintiff was "singled out to do filing and get water," and that a job assignment that was supposed to be assigned to plaintiff was taken away and given to another associate. Pl. Opp. at 9-10. Further, she stated that plaintiff "did not get [his] promotion as he [Joe McDermott] told [plaintiff] he would have, and [he] sent plaintiff to work at Livingston Plaza." Pl. Opp. at 10. While this testimony from plaintiff's direct supervisor, revealing her personal belief that plaintiff was discriminated against, supports plaintiff's claim, her statements of opinion, in and of themselves, are insufficient to defeat summary judgment. Significantly, plaintiff does not cite Ms. Miller's allegations in support of his claim of racial discrimination. Instead, he simply states that his strongest evidence of racial discrimination is that, "as an African-American male [he] was discriminated against after [his] employer learned about [his] illness." Pl. Opp. at 8.

Based on the evidence provided, including that of Ms. Miller, no reasonable juror could conclude that plaintiff has established race discrimination. First, plaintiff submitted his resume for consideration for the first Computer Associate position on November 10, 1999, only five months after he began working at the organization. Def. Ex. 5. As both plaintiff and Mr. McDermott noted, company policy restricted plaintiff from being eligible for any promotions

12

prior to working for the company for one year. Moreover, Ms. Miller failed to write him the recommendation that would have allowed Mr. McDermott to bypass the general policy.

Second, plaintiff offers no additional evidence to refute defendants stated reason – that plaintiff did not have the requisite computer mainframe experience – for declining to interview him for the second Computer Associate position. Rather, plaintiff admits that nothing in his resume, nor in his cover letter, informed defendants that he did have such computer experience.

Third, regarding the remaining Computer Specialist positions, plaintiff also concedes that he did not provide any information to defendants that would lead them to conclude that plaintiff had the requisite computer and leadership experience for the job. Pl. Dep. at 495-498. Furthermore, plaintiff offers no evidence showing that white employees, who similarly lacked such computer and leadership experience, were interviewed, and ultimately hired for the positions. Pl. Dep. at 498. Therefore, as there is no evidence from which a reasonable fact finder could conclude that defendants' stated reasons were merely a pretext, and that plaintiff was discriminated against on the basis of his race, defendants are entitled to summary judgment on plaintiff's race discrimination claim.

## II. Hostile Work Environment

Plaintiff has failed to exhaust his administrative remedies with respect to his hostile work environment claim. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 82-83 (2d Cir. 2001) ("Exhaustion of remedies is a precondition to suit."). A federal court generally may hear only claims that were either brought in the EEOC charge or are "reasonably related" to claims that were presented in the EEOC charge. *See Butts v. City of New York Dep't. of Hous. Preservation and Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993). Plaintiff referenced only race and retaliation

claims in his EEOC charge, and not a sexually hostile work environment claim. Moreover, as a sexually hostile work environment claim is not "reasonably related" to the allegations that were contained in plaintiff's EEOC charge, this court is prevented from hearing such a claim. *See Holtz*, 258 F.3d at 83 ("[A] claim raised for the first time in the district court is 'reasonably related' to allegations in an EEOC charge 'where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."). However, even if plaintiff had properly exhausted this claim, it could not succeed on the merits.

A plaintiff claiming to be the victim of a hostile work environment under Title VII must show that the "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create and abusive working environment." *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004). The test has both objective and subjective components, with the ultimate question being, "whether a reasonable person would have found [the work environment] to be [hostile], and if the plaintiff subjectively so perceived it." *Id.* Courts examine the totality of the circumstances, considering such factors as (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *See Payne v. MTA New York City Transit Authority*, 349 F.Supp.2d 619, 624 (E.D.N.Y. 2004) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment...is beyond Title VII's purview.").

Plaintiff identifies three discrete incidents to support his claim that defendants subjected

14

him to a hostile work environment – a supervisor "peeping" at him while in a bathroom stall, a co-worker's comment that she and another co-worker could "sandwich" plaintiff, and a handwritten note containing allegedly pornographic websites.  No reasonable person would conclude that those intermittent events, occurring at least three months apart, were either severe or pervasive.  The co-worker's comment, while personally offensive to plaintiff, cannot be considered anything more than a "mere offensive utterance," which is not protected under Title VII.  *See Khan v. Fed. Reserve Bank of N.Y.*, 2005 WL 273027 at *7 (S.D.N.Y.  Feb. 2, 2005) ("Casual comments or accidental, or sporadic conversation are not sufficient to establish a hostile atmosphere.").  Moreover, with regard to the "peeping" incident, defendants' subsequent investigation of the incident revealed that the supervisor was merely checking on plaintiff's health after he had been in the bathroom stall for approximately three hours.  Finally, as plaintiff himself acknowledges, he never viewed the pornographic sites.   Accordingly, plaintiff's hostile work environment claim must be rejected, and defendants' motion for summary judgment with respect to this claim is granted.

### III.  Retaliation

Plaintiff claims that defendants failed to promote him in retaliation for accompanying Ms. Miller to OCR and providing a witness account to support her discrimination complaint against another supervisor.  Plaintiff, in his opposition papers, raises the claim that defendants presented him with two insubordination letters in retaliation for filing this lawsuit on March 2, 2001.  The court will treat the complaint as amended to add this claim. Retaliation claims are analyzed under the same burden-shifting framework of *McDonnell Douglas*.  To establish a prima facie case of retaliation, plaintiff must demonstrate that (1) he was engaged in an activity

protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between plaintiff's protected activity and the adverse action taken by the employer. Here, even if this court were to assume that plaintiff has established a prima facie case of retaliation, defendants have offered legitimate, non-retaliatory reasons (and evidence supporting such reasons) for the alleged conduct. *McDonnell Douglas,* 411 U.S. at 802. Plaintiff, on the other hand, has put forth no evidence to rebut defendants' reasons, nor has he offered evidence proving that defendants' actions were a pre-text for retaliation. *See St. Mary's,* 509 U.S. at 515 ("[A] reason cannot be proved to be a 'pre-text for discrimination' unless it is both shown that the reason was false and that discrimination was the real reason.").

Regarding his failure to promote claims, as described above, defendants have proven that the NYCTA and MABSTOA had a policy of not promoting individuals until they had been working for over one year and plaintiff's evidence does not give rise to a factual issue warranting a trial.

As for the insubordination letters, they had no adverse effect on plaintiff's employment. It is undisputed that plaintiff's termination – which he does not challenge – was the result of his being AWOL for nearly two months. Thus, while the court recognizes that there exists a factual dispute about the accuracy of at least one of the March 22, 2005 insubordination letters, viewing the totality of the circumstances, this dispute does not require a trial. The evidence, when taken as a whole, and assuming plaintiff's version of the facts is true, does not provide a sufficient basis for a reasonable juror to conclude that defendants were retaliating against plaintiff. Defendants' motion for summary judgment with respect to these claims is granted.

**IV. Disability**

In his opposition papers, plaintiff raises for the first time, the claim that defendants violated the ADA by terminating him upon "learning of his illness." Pl. Opp. 6-8. Even were this court to allow plaintiff to amend his complaint to add an ADA claim, plaintiff has failed to exhaust his administrative remedies because, as discussed above, plaintiff identified only race and retaliation as bases for wrongdoing in his EEOC charge, and made no mention of discrimination based on disability. *See MacArthur v. Carrier Corp.*, 2005 WL 2437030 at *4 (N.D.N.Y. Sept. 30, 2005).

Moreover, even if this court were to consider the merits of such a claim, plaintiff's claim does not meet the threshold definition of having a disability. Under the ADA, an individual is defined as disabled if he or she (1) suffers from physical or mental impairment that substantially limits one or more major life activities; (2) is a person who has a history or record of such an impairment; or (3) or is a person who is perceived by others as having an impairment. 42 U.S.C. §§ 12012 *et seq*. Plaintiff provides no evidence that he suffered from any impairment that substantially prevented him from any major life activity. Plaintiff also provides no evidence that he ever gave his employer reason to assume that he had a disability. Instead, he offers a doctor's note from his family physician indicating that he suffered from the flu in January of 2000, along with a psychiatric evaluation performed *after* his termination, to support his personal belief that he was disabled and that his employer knew of the disability, and thus terminated him.

Tellingly, plaintiff fails to identify from what disability he is suffering – leaving defendants, and this court, to "diagnose" him based on vague references to enormous stress, a bleeding scalp, loss of hair, and little social interaction with employees. Such information is

17

wholly insufficient to allow any reasonable juror to conclude that plaintiff was disabled, let alone that he was discriminated against by defendants. Accordingly, defendants are granted summary judgment on plaintiff's federal disability claim.

**V. State and Local Law**

Since the substantive law governing plaintiff's claims of discrimination, hostile work environment, and retaliation under New York state and local law is essentially identical to that of claims brought under Title VII, summary judgment is granted in favor of defendants with respect to plaintiff's state and local law discrimination, hostile work environment and retaliation claims. *Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 n.2 (2d Cir. 2003).

Having dismissed plaintiff's federal disability claim, this court declines to exercise supplemental jurisdiction over any related state and local law disability claims. *Giordano v. City of New York*, 274 F.3d 740, 754-55 (2d Cir. 2001) ("the appropriate analytic framework to be applied in [disability] discrimination claims is best left to the courts of the State of New York.").

The court declines to exercise supplemental jurisdiction over plaintiff's state law tort claims.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted as to all of plaintiff's claims under federal law and as to all of plaintiff's state and local law discrimination, hostile work environment and retaliation claims. The Clerk of Court is directed to enter judgment accordingly. Since this court declines to exercise supplemental jurisdiction over plaintiff's state and local law disability and state law tort claims, those claims are dismissed without prejudice.

**SO ORDERED.**

*/s/ Nina Gershon*
**NINA GERSHON**
**United States District Judge**

**Dated:** **Brooklyn, New York**
**November 23, 2005**